IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

DEBRA L GLANTON,

      Plaintiff,

v.                                                                    CASE NO. 1:14-cv-106-WS-GRJ

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security Administration,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for a period of disability and disability insurance benefits. Doc. 1. The Commissioner has answered, Doc. 10, and both parties have filed briefs outlining their respective positions. Docs. 16, 18. For the reasons discussed below, it is recommended that the Commissioner's decision be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for a period of disability and disability insurance benefits and supplemental insurance income on September 15, 2010, alleging a disability onset date of September 17, 2009. (R. 140-45.) Plaintiff's application was denied initially and upon reconsideration.[1] (R. 61-72, 74-76.) At Plaintiff's request, an administrative law judge ("ALJ") conducted a hearing on June 26, 2012. The ALJ

_____

[1] Plaintiff was found not to be eligible for SSI because she had too much income. (R. 63.)

entered an unfavorable decision on August 7, 2012.  (R. 12-22.)  The Appeals Council

denied Plaintiff's request for review on April 18, 2014.  (R. 1-4.)  This action followed.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more

than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[4] The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the decision.[5]

However, the district court will reverse the Commissioner's decision on plenary review if

---

[2] *See* 42 U.S.C. § 405(g) (2000).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7]  The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[10]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[11]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is

---

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

disabled.[12]  Fourth, if a claimant's impairments do not prevent him from doing past

relevant work, he is not disabled.[13]  Fifth, if a claimant's impairments (considering his

residual functional capacity ("RFC"), age, education, and past work) prevent him from

doing other work that exists in the national economy, then he is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant

work initially lies with the plaintiff.[15]  The burden then temporarily shifts to the

Commissioner to demonstrate that "other work" which the claimant can perform

currently exists in the national economy.[16]  The Commissioner may satisfy this burden

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive

determination that a claimant is disabled or not disabled.[17]

---

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F.
3d 1274, 1278 (11th Cir. 2001).

[16] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner.
> The Commissioner must produce evidence that there is other work
> available in significant numbers in the national economy that the claimant
> has the capacity to perform.  In order to be considered disabled, the
> claimant must then prove that he is unable to perform the jobs that the
> Commissioner lists. The temporary shifting of the burden to the
> Commissioner was initiated by the courts, and is not specifically provided
> for in the statutes or regulations.) (Internal citations omitted).

[17] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden
has shifted to the Commissioner to show that the claimant can perform other work.").

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[18]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[21]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## III.  SUMMARY OF THE RECORD

### A.    Medical Evidence

Because Plaintiff's argument is that the ALJ failed to discuss Plaintiff's migraines and therefore failed to consider her impairments in combination, the Court's summary

---

[18] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[19] Walker, 826 F.2d at 1003.

[20] Wolfe, 86 F.3d at 1077-78.

[21] *See id.*

of her medical records will focus on those relating to her migraines.

Records from the Dixie County Health Department, where Plaintiff received her primary care, disclose that she complained of migraines on several occasions. However, the treatment notes from May 23, 2008, state that there is "considerable embellishment of her symptoms."  (R. 244, 249, 266, 274, 277, 292, 293, 295, 296, 298.)  Those records reflect that Plaintiff could not take Imitrex because of her blood pressure issues.

On November 9, 2010, Plaintiff underwent a consultative examination with Lane Chodosh, M.D.  Plaintiff reported almost daily headaches with nausea, head pain, weakness, and trembling.  Dr. Chodosh opined that Plaintiff could stand, walk, sit, stoop, squat, kneel, lift, carry, handle objects, see hear, and speak normally.  (R. 328, 331.) Dr. Chodish found that Plaintiff's hypertension was under fair control with no complications and headaches. (R. 328, 331.) Dr. Chodish's report does not contain any finding that Plaintiff's migraine headaches caused additional limitations on Plaintiff's ability to perform basic work-related activities.

A Physical Residual Functional Capacity Assessment was completed on December 21, 2010 by state agency physician Connie Griffis. Dr. Griffis notes that "claimant has allegations of migraines, but there is no medication for migraines, and no mention in MER since 2006."  (R. 55.)

On December 15, 2010, Plaintiff underwent a consultative psychological evaluation with William Benet, Ph.D., Psy.D.  (R. 334-37.)  At the exam Plaintiff reported a history of migraines. The mental status examination was essentially normal as evidenced by Dr. Benet's statements that Plaintiff was alert, oriented, neatly

dressed, quiet, friendly and cooperative. (R. 336.)  Moreover, Dr. Benet found that

Plaintiff's speech was clear, coherent, and relevant and her thinking was organized and

goal-oriented.  Notably, despite Plaintiff's complaints of migraines, Dr. Benet found that

Plaintiff's attention and concentration were adequate. (*Id.*) Dr. Benet opined that

Plaintiff should be able to perform work-related mental tasks involving understanding

and memory, sustained concentration and persistence, social interaction and

adaptation. (R. 334-37.)

## B.    Hearing Testimony

Plaintiff was fifty-two years old and had a high school diploma at the time of her

administrative hearing.  Plaintiff testified that she did not have health insurance, and

therefore she received care and medications on a "low rate scale" at the Dixie County

Health Department.  Plaintiff previously worked as a cook at Hardee's and McDonald's

restaurants.  She estimated that she had to lift and carry about fifteen pounds in that

job.  (R. 29-34.)

Plaintiff testified that she had been diagnosed with diabetes, and took insulin and

metformin.  She had to check her blood sugar levels regularly twice a day and typically

had relatively high readings.  Plaintiff stated that she would get dizzy and blurry vision if

her sugar levels were off.  She could put glucose under her tongue if her sugars

became too high.  If her symptoms remained, she would lay down and rest and take an

insulin shot.  Plaintiff testified that she also suffered from left leg and hand pain due to

arthritis, and high blood pressure, for which she took medication.  Plaintiff could tell

when her blood pressure got too high because she got headaches and became

lightheaded.  (R. 34-38.)

Plaintiff also testified about her mental health issues.  She had been diagnosed with anxiety and post-traumatic stress disorder, but she was not currently undergoing any treatment for these issues, although she was taking medication.  Plaintiff testified that she felt her medications helped her "sometime."  (R. 38-39.)

Plaintiff's daily routine consisted of waking up, washing her face and brushing her teeth, praying, checking her sugars and taking her medications, preparing meals, watching television, resting, and doing laundry.  She also helped to take care of her mother before she passed away by bathing and feeding her, although primarily there was a nurse that would come in to take care of her.  Plaintiff typically went to church three days a week, and drove herself there. (R. 39-42.)

Upon questioning from her representative, Plaintiff explained that she quit working at Hardee's because she got dizzy at work, and then found out she was diabetic.  After that she gave two weeks notice because she felt that she was not able to do the job in her condition.  When Plaintiff became dizzy at work before, her boss gave her breaks throughout the day.  She explained that her manager sent her home sometimes because she was sick.  Plaintiff stated that she did not think she could go back to work because she could not stand that long, and she could not see the menu screen because of her eyesight. Plaintiff testified that she needed prescription glasses, but had not been able to get them because of the cost.  (R. 42-47.)

A Vocational Expert (VE) also testified at the hearing. The ALJ posed a hypothetical question to the VE that included light lifting and carrying, an at-will sit/stand option, and no ladder, rope, or scaffold climbing, and only occasional postural motions otherwise.  The hypothetical person needed to avoid dangerous work hazards such as

unprotected heights, exposed machinery, and extreme heat and humidity. Work was limited to routine and uncomplicated work, at a non-assembly or non-fast pace.  The VE testified that this would eliminate Plaintiff's past work, but identified several jobs in the national and local economies that fit the age, education, and non-exertional and exertional limitations of the hypothetical individual, such as cashier II, ticket taker, and ticket seller. The ALJ then asked whether any of these jobs would accommodate additional breaks.  The VE testified that typically, extra breaks would not be tolerated. (R. 47-52.)

## C.     The ALJ's Findings

The ALJ found that Plaintiff met the insured status requirements through June 30, 2014, and had not engaged insubstantial gainful activity since the alleged onset date.  The ALJ found that Plaintiff had the severe impairments of diabetes, hypertension, hand and finger arthritis, depression, and anxiety, but that none of the impairments met or medically equaled the severity of a listed impairment.

The ALJ found that Plaintiff's had the residual functional capacity to perform light work with the limitations that she needed a sit-stand option with an opportunity to change positions as often as every forty-five minutes, she must avoid climbing ladders, ropes, and scaffolds, and must perform only occasional postural motions otherwise. She limited Plaintiff to avoiding work hazards such as unprotected heights, exposed machines, and extreme heat and humidity.  She also limited Plaintiff to routine, uncomplicated tasks performed at a non-assembly/fast pace.

Based upon this RFC finding and vocational expert testimony the ALJ found that Plaintiff could not return to her past relevant work. However, relying upon the testimony

of the VE, the ALJ found that Plaintiff could perform other jobs existing in significant numbers in the national economy, such as cashier II, ticket taker, and ticket seller. Accordingly, the ALJ found that Plaintiff was not disabled.  (R. 12-22.)

## IV.  DISCUSSION

Plaintiff raises only one argument on appeal. Plaintiff argues that the ALJ did not consider her migraine headaches and thus did not evaluate the effects of all of her impairments in combination on her ability to work at Step 4 and Step 5 of the sequential evaluation process.

Plaintiff's entire argument is premised on that fact that the Dixie County Medical Records show she has a history of migraines and Dr. Benet, the consultative psychological examiner, noted on her report that Plaintiff has a history of migraines. From this premise Plaintiff says the ALJ erred by failing to consider the effects of Plaintiff's migraines in combination with Plaintiff's other impairments.  Neither the ALJ nor any consultative examiners questioned whether Plaintiff had a history of migraines. Rather, although Plaintiff testified that she has headaches when her blood pressure is elevated, Plaintiff never said her migraines limited her ability to engage in basic work-related activities.  And while the treatment records from Dixie County Health Department do contain evidence that Plaintiff had complained about headaches the records do not show that Plaintiff complained of headaches on a frequent or regular ongoing basis. (R. 242-322, 356-379, 395-434.)  More notably, however, despite complaints of headaches, no physician at the Dixie County Health Department and no physician who examined Plaintiff in this case or offered an opinion based upon Plaintiff's medical records, has suggested that Plaintiff's migraine headaches have

affected her ability to work, at least in a twelve-month consecutive period.  Thus, in the absence of any medical evidence (or testimony from the Plaintiff) suggesting that migraines caused any additional limitations on her ability to perform basic work-related activities, the fact that the ALJ did not specifically discuss Plaintiff's migraines does not constitute error. The ALJ did not err because she thoroughly discussed and considered in her evaluation the treatment records from the Dixie County Health Department covering treatment from July 30, 199 to May 17, 2012 (R. 242-322, 356-379, 395-434), and the November and December 2010 consultative examinations performed by Dr. Chodosh (R. 323-332) and Dr. Benet. (R. 333-338.)

The Dixie County Health Department records do not contain any evidence that Plaintiff's migraines caused her any limitations. Dr. Chodosh's report of the consultative examination confirmed that there were no limitations for the ALJ to consider concerning Plaintiff's migraines.  Dr. Chodish concluded that Plaintiff's hypertension—which Plaintiff testified causes her headaches—was under fair control with no complications and chronic headaches, as Plaintiff described. In short, there is absolutely nothing in Dr. Chodish's report that Plaintiff's migraines caused additional limitations on her ability to perform work-related activities.

The same is true for Dr. Benet, who performed a consultative psychological evaluation of Plaintiff in December 2010.  While Plaintiff complained of difficulty keeping under control sugar diabetes, blood pressure and migraines, the mental status examination was normal.  Dr. Benet found that despite Plaintiff's complaints, Plaintiff was alert, oriented, quiet, friendly and cooperative. Plaintiff's speech was clear and coherent and her thinking was organized and goal-directed.  And Plaintiff's

concentration and attention were adequate.  Notably, Dr. Benet concluded, after examining Plaintiff, that Plaintiff's cognitive functioning was intact with no impairment in reasoning or memory functioning.  Accordingly, Dr. Benet having found that Plaintiff did not have any significant limitations opined that Plaintiff "should be able to perform work-related mental tasks that involved understanding, memory, sustained concentration, persistence, social interaction and adaption. (R. 336.)  There is no mention in Dr. Benet's report that Plaintiff's migraine headaches caused any additional limitations.  Thus, it stands to reason that the ALJ did not specifically discuss Plaintiff's migraines because there was no reason to do so in view of the fact that there is nothing in the record suggesting that Plaintiff's migraines limit her ability to perform work related mental tasks.

In addition to the fact that there was no reason in this case for the ALJ to specifically discuss Plaintiff's migraines, the Court is required to assume the ALJ considered the impairments in combination because the ALJ expressly stated during step three of the sequential analysis that Plaintiff "does not have an impairment or a combination of impairments" that met or equaled a Listing, and the ALJ said that she considered "the possibility that the combined effect can be greater than each of the impairments considered separately." (R. 15, 20.)  The Eleventh Circuit has repeatedly held that an ALJ's finding regarding a claimant's "impairment or combination of impairments" establishes that the ALJ has considered the impact of the combined impairments.[22]

---

[22] *Wilson v. Barnhart*, 284 F.3d 1219, 1224-25 (11th Cir. 2002); *Jones v. Dep't of Health & Human Servs*., 941 F.2d 1529, 1533 (11th Cir. 1991); *Wheeler v. Heckler*, 784 F.2d 1073 (11th Cir. 1986).

As the Eleventh Circuit explained in *Wilson* this statement is sufficient to establish that the ALJ has considered the combined impact of all impairments.  284 F.3d at 1224-25.

Accordingly, the Court concludes that the ALJ did not err by failing to mention specifically Plaintiff's migraines in view of the fact that there was no evidence in the medical records, and no evidence offered by Plaintiff in her testimony, suggesting that Plaintiff's migraines limited her ability to perform work-related activities.  The Court further concludes that the ALJ properly considered Plaintiff's impairments in combination, as evidenced by the ALJ's statement that she had considered the combined impairments, and as evidenced by the ALJ's thorough discussion of Plaintiff's medical history, and the ALJ's assessment in the RFC of limitations that pertained to her impairments.

## V.  CONCLUSION

For the foregoing reasons, it is respectfully **RECOMMENDED** that the decision of the Commissioner denying benefits to Plaintiff should be **AFFIRMED.**

**IN CHAMBERS** at Gainesville, Florida, this 6th day of August, 2015.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.